275 A.2d 272.

PETITION OF HUMPHREY STATTER, *Trustee u/w of* JAMES A. ABELES.

MARCH 24, 1971.

PRESENT: Roberts, C. J.. Paolino, Powers and Kelleher, JJ.

KELLEHER, J. Humphrey Statter has been a member of the New York bar since 1934. He is also one of three trustees of an estate created by the will of James A. Abeles. This is a civil action filed in the Superior Court in October 1967 where he asks the court to order the trustees to make an accounting. He also seeks judicial confirmation and approval of certain actions taken by them since the trust was established in 1961. The defendants are Statter's fellow trustees and the beneficiaries of the Abeles trust. They filed a counterclaim in which they seek the removal of Statter as a trustee because of "irreconcilable hostility"

which has arisen between them and Statter. A justice of the Superior Court referred the case to a master. The master recommended that the accounting be made and that Statter be removed as a fiduciary. The trial justice affirmed the master's findings in all respects but one; he ordered the removal of all three trustees and their replacement by a corporate trustee. Statter has taken this appeal.

James A. Abeles died on June 17, 1961, a resident of Jamestown. His will was admitted to probate. It established a trust of the residuary estate. Statter and the testator's two sons, William and James, were designated as the trustees. The testator's widow, his brother, and a Rhode Island attorney were nominated and qualified as executors. Statter was designated as a possible alternate executor in the event any of the named executors failed to serve. The income beneficiaries of the trust are the testator's widow, his housekeeper, his sister-in-law, his nephew and his two sons.[1] The widow was to receive $1,000 annually as long as she occupied the testator's Jamestown home. She was also to receive from the trust income, monthly payments of $800. The housekeeper, a family retainer for over 30 years, was to be paid an indefinite monthly amount which when added to her other net income,[2] would assure her of a lifetime monthly income

---

[1]The testator was married twice. His first wife died in 1956. James and William were born of the first marriage. When this matter came on for a hearing before the master, the housekeeper was 72; the nephew was 64; James was 52 and William was 49. The testator's sister-in-law died in July 1968 and at the time of her death she was 77. Although the widow was served with process, she did not participate in the hearings. There is no evidence that she was then claiming any interest in the trust.

[2]The provision authorizing this payment reads:

"2. The trustees shall make such payments monthly to Paula List during her lifetime as, together with the income available to her from other sources, as reported by her in writing on request from time to time, will never total less than Three Hundred Fifty Dollars ($350.00) per month above all income taxes."

of $350. The sister-in-law and the nephew were to be the recipients of monthly payments of $300 each. The sons were to share the surplus income on a 60/40 percentage basis. William was to receive the larger share. The trust was to terminate upon the death of the last-named income beneficiaries with the exception of the two sons. Upon termination of the trust, the principal was to be distributed to William and James in the same proportion as they received the income. If either died leaving issue, their issue[3] would take *per stirpes*. The trust became operative in 1961. When Statter testified before the master in August 1968, he valued the trust assets to be about $750,000.

We shall briefly describe the events which have precipitated this litigation.

Three weeks before he died, James A. Abeles sold a large number of shares of stock of Purolator Products, Inc. for $1,348,900. At this time Abeles, who was the president of Purolator, was in his late seventies and ailing. Statter represented Abeles at the sale and he received the million dollar plus check. The attorney testified that in compliance with the express directions of his client he deposited these funds in a joint checking account which stood in the names of the testator and his wife. The transaction took place in New Jersey and the money was deposited in a bank located there.

The Abeles will was admitted to probate on June 26, 1961. His widow claimed that the funds in the joint account were hers. The estate was faced with the threat of insolvency! After negotiations, an agreement was reached whereby the widow would, in consideration of the payment of $200,000 from the account, turn over the balance of the account to the testator's estate. This agreement was consummated on July 24, 1961. Later, the Jamestown

---

[3]Only James has issue, two adult children and one infant grandchild. William is married but has no issue.

Probate Court granted the executors' petition to compromise the widow's claim. The petition alleged that consideration for the compromise was the widow's release of her rights to a cash legacy of $10,000, the money in the joint account and any fee due her as an executor. She resigned as executor and no successor was ever appointed.

On the day he died, James A. Abeles was the registered owner of 3,408 shares of Purolator stock. The executors could only account for 3,308 shares. They reported the loss of 100 shares and a new certificate was issued to the executors for the missing shares. Almost five years after his father's death in April 1966, William discovered two certificates each representing 50 shares of Purolator. They were endorsed in blank by the deceased. William claimed that in 1958 his father had given him the 100 shares as a Christmas present. The 100 shares had, because of a stock split and a stock dividend, a value equivalent to 315 shares. The 315 shares, however, at this point were part of the trust corpus. When William first presented the missing certificates, his brother, James, expressed some doubt whether the gift had been made. Statter, however, felt there had been a gift of the shares but declared that he would become a party to an agreement transferring these shares out of the trust to William, only if the Superior Court approved the transfer. Later, however, James assigned to William his 40 percent interest in income earned by the 315 shares.

Checking accounts were established in two Rhode Island banks for the purpose of receiving and disbursing both principal and income. Check signing by the trustees was a problem. They live in three different states. Statter resides in New York. James, who succeeded his father as president of Purolator, is a resident of New Jersey and William lives in Florida. To facilitate matters, the trustees agreed that it would not be necessary for all three

to sign checks. Instead, the trustees notified the bank where the income account was maintained that checks might be signed by their Rhode Island agents. The agents were the attorney for the estate and the trust's investment advisor. In August 1966 Statter notified each bank and his fellow trustees that he was revoking the check-signing authority previously granted. He attributed his actions to the fact that he had not received a statement of the trust's transactions for over a year.

The attorney for the estate sought to arrange a meeting of the trustees at her Providence office for the purpose of reconciling the differing points of view held by the trustees. Near the end of September 1966, Statter notified the attorney that he saw no need to "travel all the way up there [Providence]." The other two trustees were amenable to such a gathering. Statter also reiterated his desire for court approval of all past actions of the trustees. The following month Statter went to New Jersey and conferred with James. The meeting was held at the offices of Purolator. Also in attendance was an associate of the estate's attorney. William who was in Florida participated in the conference by way of a telephonic hookup. It appears that this conference resolved the trustees' differences.

The plaintiff waived his demand for an accounting. It was agreed that the trust's assets were to be held by a Rhode Island bank in a custodian account. Disbursements of income were to be made on the order of the trustees.

Thereafter, the custodian bank informed the trustees of their difficulty in attempting to determine the indefinite income payment due the housekeeper. James and William entered into an agreement with the housekeeper whereby

she agreed to waive all her rights[4] under the trust in exchange for a monthly payment of $200 to be paid from the trust income due the brothers and was to continue each month as long as she lived. James' children, as contingent remaindermen, also agreed that, in the event of the death of either their father or William, they would execute such documents as were necessary to insure an uninterrupted flow of the periodic payments of $200 due the housekeeper. Statter's counsel refused to recognize this agreement and termed it a complete nullity.

The Abeles brothers became disturbed when in 1967 plaintiff demanded a retroactive increase in his annual trustee's fee. They claimed that in 1961 Statter had agreed that his annual fee would be $750.

One other incident worth relating is the controversy which ensued when the executors filed their final account in the Jamestown Probate Court. A copy of the account was sent to Statter. Schedule B contained an item which showed that the executors had made a final payment to the trustees of approximately $12,000. At the time the account was filed, this money had not been actually deposited in the trustees' account. It was explained by the local attorney, who was also one of the executors, that the transfer would be made only after the court had given its approval to the account. She stated her reason for deferring payment to the trustees was the possibility that some additional fees or charges might be ordered by the court and that it would be paid from the $12,000 des-

---

[4] We are unable, from the record before us, to tell how much has been paid annually to the housekeeper since the trust first became operative. There is one exhibit, however, which shows that Paula, the housekeeper, received $985 during the trust's first fiscal year. The will also provided that the trustees were given the discretion to use the principal if, because of illness or accident, Paula's income was inadequate to "properly care for her." The average annual income for the period that the trust was fully operative is approximately $24,500.

tined for the trust. The Probate Court was notified that the payment had not been made. The account was approved as filed subject to the executors' filing a receipt in court for the moneys paid to the trust. This was done.

Statter maintains that the executors by so listing the $12,000 exposed him and his fellow trustees to the risk of being surcharged. It is clear that he was informed as to the procedure to be followed in the Probate Court. Nevertheless, in a letter sent to his co-trustees he threatened to hire Rhode Island counsel to object to what he said was "an admittedly false" account and compel the delivery of the balance of the trust property. He hired counsel. The balance due the trust was paid. Rather than going to the Probate Court, Statter went instead to the Superior Court where he filed this present complaint.

Throughout all these proceedings, Statter has maintained that he bears no ill will towards anyone. If there is hostility, he says, it flows from the brothers who, he claims, are unaware of a trustee's duties and responsibilities. He points out that although a compromise of the widow's claim was approved by the Jamestown Probate Court, there is nothing in that court's record to show that the widow, when she received the $200,000, was releasing any rights she had in the trust. He also stresses the fact that the entry in the executors' account exposed the trustees to a personal liability. He says that the desired accounting would provide a vehicle whereby William would receive his 315 shares of stock free of any claim by the trustees or beneficiaries. He emphasizes that there is a possibility that there may be issue yet unborn who might someday seek to hold him liable for the trustees' actions which have gone unaccounted for since 1961.

The defendants take the position that the various fees and expenses involved in the accounting would constitute

an unnecessary depletion[5] of the trust. Statter's refusal to come to Providence to attend a trustees' meeting, his request for an increase in his annual fee to $2,000 and his unilateral revocation of the agents' authority to sign checks, they claim, constitute demonstrable evidence of his irritant behavior. There is evidence that the payments due the income beneficiaries were delayed because of plaintiff's direction to the banks not to honor the signatures that they had previously been authorized to honor.

Before we consider the hostility issue, we shall dwell briefly on defendants' assertions that plaintiff's objections to the master's reports should not be considered because they are too broad. This contention apparently overlooks the fact that this case is governed by Super. R. Civ. P. Rule 53 (e)(2) provides that "any party may serve written objections" but it does not require that objections be taken to the master's findings. *Henry Hanger & Display Fixture Corp.* v. *Sel-O-Rak Corp.*, 270 F.2d 635 (5th Cir. 1959). The rule also authorizes the court to adopt the report or "reject it in whole or in part." An exceptant's lack of specificity does not limit this power. If no specific objections are made, he runs the risk that the court will adopt the master's findings in toto. 5 Moore, *Federal Practice* §53.11 at 2992 (2d ed. 1969); 2B Barron & Holtzoff, *Federal Practice and Procedure* §1171 at 608. While a litigant's failure to file specific objections to a master's report may

---

[5]Statter insisted that Rhode Island law required the trustees to file an account in the Superior Court and in an August 1966 letter he said that he would hire independent counsel to compel the accounting and charge the fees, expenses and costs against the principal of the trust. The estate's attorney who had been representing the trust informed Statter and the other trustees that in this state the filing of trustees' accounts is purely permissive and not mandated by statute. She was correct. There is nothing in the General Laws which requires a trustee to file a periodic accounting with the court. Section 18-6-3 states that a trustee "may apply to the superior court for the allowance of his account or accounts."

not be fatal, we do believe that he has a responsibility to assist the trial court and this court by making specific objections rather than setting them forth in a generalized fashion. See *United States* v. *Merz,* 376 U.S. 192, 84 S.Ct. 639, 11 L.Ed.2d 629. An examination of plaintiff's many objections shows that they are indeed quite specific.

Under Rule 53(e)(2) a Superior Court justice is bound to accept the master's findings of fact unless "clearly erroneous." Although we are reviewing the Superior Court's findings rather than the master's determinations, we are guided by the same criterion. We shall accept the findings of the trial justice unless the plaintiff persuades us that they are clearly wrong.

When friction between the trustee and beneficiary or between the trustee or his co-trustees impairs the proper administration of the trust or if future cooperation between the trustees is improbable or if the trustees' continuing to act as such would be detrimental to the interest of the beneficiary, the trustee may be removed. *In re Estate of Gilmaker,* 21 Cal. Rptr. 585, 371 P.2d 321; *Smith* v. *Biggs Boiler Works Co.,* 33 Del. Ch. 183, 91 A.2d 193; *Gordon* v. *Gordon,* 332 Mass. 210, 124 N.E.2d 236; *Vest* v. *Bialson,* 365 Mo. 1103, 293 S.W.2d 369; *In re Lipsit,* 50 Misc.2d 289, 269 N.Y.S.2d 989; *In re Corr Estate,* 358 Pa. 591, 58 A.2d 347; 1 Restatement (Second) *Trusts* §107 comments a and c; 2 Scott, *Trusts* (3d ed.) §107; see also 63 A.L.R.2d 523. In deciding such cases the court's paramount duty is to see that the trust is properly executed and that the beneficiaries are protected. Bogert, *Trusts and Trustees* (2d ed.) §527 at 378-79. When the ill feeling has reached the point that it interferes with the administration of the trust, the trustee may be removed even though the charges of his misconduct are either not made out or greatly exaggerated. *May* v. *May,* 167 U. S. 310, 17 S.Ct. 824, 42 L.Ed. 179; *Shirk* v. *Walker,* 298 Mass. 251, 10 N.E.2d 192. Trustees exist for

the benefit of those to whom the creator of the trust has given the trust estate. *Lister v. Weeks*, 60 N. J. Eq. 215, 46 A. 558.

The master found that plaintiff's conduct was unduly arbitrary and that this behavior led to the estrangement that has developed between Statter and his co-trustees and some of the beneficiaries. In making this determination, the master resolved any issues involving credibility against Statter. He faulted plaintiff's refusal to come to Rhode Island to attend a conference with his fellow trustees. Statter was also criticized for his unilateral cancellation of the bank's authority to issue checks due the beneficiaries. The master made a further finding that Statter had agreed to an annual trustee's fee of $750.

Statter denied that he had agreed to take a $750 fee. He sought to excuse his failure to come to Providence on the basis that he was desirous of saving the trust of what he considered unnecessary travel expense. The master, of course, believed the testimony of James when he said that plaintiff had indeed agreed to the $750 fee. There was also evidence that plaintiff had been paid an annual fee of $750 during the five-year period when peace and harmony reigned between the litigants. Although Statter in one of his letters did speak about his desire that travel expenses be kept to a minimum, the master, in considering plaintiff's failure to come to Rhode Island, put more stock in the later letter where he complained about the necessity to "travel all the way up there [Providence]." In this later communication he made no mention of his concern of his efforts to conserve the trust assets.

As plaintiff concluded his direct testimony before the master in the summer of 1968, he expressed a concern that he might be surcharged because the trustees had not made any payments to the widow as called for in the trust. He made this assertion because he had previously pointed out

to the master that none of the probate documents relating to the release of her claim speak of her interest in the trust. Statter explained to the master that the first time he saw a copy of the claim was the day of the hearing. It is obvious, however, that in July 1961 the executors had reached an agreement with the widow and her New Jersey attorney whereby she would release any claim or interest she might have in the joint bank account, the will or the trust thereunder. Once the settlement was agreed upon, the implementing documents were prepared and executed. One such document was the widow's release of any and all rights she had in the trust. If in 1966 Statter had left New York and taken either about a three-hour ride by car or a short flight to Providence, he could have then examined all the records relating to the Abeles' trust, including the widow's release, and thereby might have saved himself some mental anguish.

Uncontradicted evidence of the deterioration of the good feeling that once existed within the trust can be seen by an examination and analysis of the many letters sent by Statter to James and William. In September 1963 he wrote to James and said that "I will be glad to meet with you at any time and place that you may find convenient." Later, in December 1964, he wrote to James and William and expressed to both sincerest and best wishes for Christmas and the New Year. In the fall of 1966, however, he refused to come to Providence and there were no Christmas greetings that year. We need go no further. There is legally competent evidence which shows an antagonistic attitude between the trustees which has brought the operation of the trust to a halt. Periodic income payments due the beneficiaries were not made. Appropriate action was called for.

We are well aware of the principle that a court should be more reluctant to remove a trustee named by the settlor than a trustee named by the court or by a third person in the exercise of a power to appoint a trustee. *Curran* v.

338

*Green,* 18 R. I. 329, 27 A. 596; Restatement (Second) *Trusts, supra;* 2 Scott, *Trusts* (3d ed.) §107.1. Where, however, the acrimony between the trustees has reached the point where there is lack of cooperation between the fiduciaries, the court's regard for the interest of the trust and the rights of the beneficiaries may mandate a change of trustees. The primary jurisdiction for removal of a trustee in such circumstances lies with the discretion of the Superior Court. *Garneau* v. *Garneau,* 63 R. I. 416, 9 A.2d 15. We can find no abuse of this discretion by the court in the action it has taken in the case at bar.

The plaintiff's appeal is denied and dismissed.

JOSLIN, J., did not participate.

*Moore, Virgadamo, Boyle & Lynch, Francis J. Boyle, Laurent L. Rousseau,* for plaintiff.

*Tillinghast, Collins & Graham, Edwin H. Hastings,* on behalf of James D., William K. and James B. Abeles, William Van Z. Batchelder, Paula List, and Elizabeth K. Abeles Heald, Beneficiaries under Article Sixth of the Will of James A. Abeles, defendants.