DECISION
This matter is before the Court following a nonjury trial. At issue is the miscellaneous petition of Mary F. Goodness (hereafter "Mary") to remove her husband Francis I. Goodness, Jr. (hereafter, ("Francis"), as Co-Trustee relative to an irrevocable "Special Needs Trust" entitled the Matthew W.T. Goodness Trust (hereinafter, the "Trust") that was established for the benefit of their son, Matthew W.T. Goodness (hereafter, "Matthew" or "primary beneficiary"). Also before this Court by way of counterclaim, is a similar petition by Francis to remove his wife, Mary, as Co-Trustee of the Trust. This Court has jurisdiction over the matter pursuant to G.L. 1956 §§ 8-2-13 and 18-2-1, which afford this Court exclusive jurisdiction over the Trust.[1] *Page 2 
The Trust, according to its terms, is funded with the monthly income payable to Matthew from an annuity, purchased as part of a structured settlement of a civil lawsuit brought by Matthew through his parents, which settlement resolved a medical malpractice action filed on behalf of Matthew. Mary seeks to remove Francis from his role as Co-Trustee, alleging unsuitability and breach of fiduciary duty. In his counterclaim, Francis seeks Mary's removal as Co-Trustee on similar grounds.
 I Standard of Review
It is axiomatic that "[t]he Superior Court has exclusive original jurisdiction, except as otherwise provided by law, of suits and proceedings in equity and it is within the power of that court to advise and direct trustees as to the management of trust estates and to enter decrees for that purpose." Concannon v. Concannon. 116 R.I. 323, 328,356 A.2d 487, 491 (1976) (citing Gardner v. Sisson, 49 R.I. 504,144 A. 669 (1929)). Accordingly, the removal of a trustee and the appointment of a successor trustee, as well as the ordering of an accounting, "pertain to matters that are particularly within the jurisdiction of the [S]uperior [C]ourt to supervise the administration of trust estates."Garneau v. Garneau, 63 R.I. 416, 9 A.2d 15 (1939). "In deciding such cases[,] the [C]ourt's paramount duty is to see that the trust is properly executed and that the beneficiaries are protected."Petition of Statter. 108 R.I. 326, 335, 275 A.2d 272, 276(1971). *Page 3 
 II Findings of Fact
In the instant matter, Mary petitioned the Court to remove Francis as Co-Trustee of the Trust. Francis responded by filing a counterclaim seeking Mary's removal as Co-Trustee. Each party has made various allegations of unfitness against the other. An evidentiary hearing was held over two days. The following individuals testified at that hearing: Paula Cuculo, Esq. ("Attorney Cuculo"), the Court-appointed guardian adlitem for Matthew Goodness, Mary Goodness, Kent Clarke ("Mr. Clarke"), Angelita Carpenter ("Mrs. Carpenter"), [2] Peter Carpenter ("Mr. Carpenter"), and Francis Goodness. In addition to the trial testimony, the record contains numerous documentary exhibits, including detailed records of bank transactions and a written report from the guardian adlitem.[3]
The Court now makes the following findings of fact pursuant to Super. R. Civ. P. Rule 32(a):
1. Matthew was born on February 25, 1986. Due to cerebral palsy, Matthew has been disabled and entirely dependent on the care by others for all of his daily activities. Matthew currently receives a monthly annuity as part of the settlement of a civil lawsuit brought by Matthew, through his parents, which settlement resolved a medical malpractice action filed on behalf of Matthew. He currently lives in a studio apartment that is located in a one-story duplex property. His mother, Mary, and his two minor siblings live in the adjacent apartment. Both units are located in a one-level duplex house.
2. On February 22, 1990, the Trust was established with Matthew as the named primary beneficiary and his parents, Francis and Mary, as Co-Trustees and the named secondary beneficiaries. By its terms, the Trust was to expire on Matthew's eighteenth birthday.
3. On March 26, 1990, Jamestown Life Insurance Co. agreed to pay a deferred annuity beginning on February 26, 2004, Matthew's eighteenth birthday. Thus, by its own terms, the Trust would terminate on the very same day it was scheduled to receive its first *Page 4 
deferred annuity payment.[4] Before Matthew's eighteenth birthday, the Trust was extended by a Justice of this Court for the remainder of Matthew's lifetime.
4. After the formation of the Trust, Mary and Francis, established the Matthew W. T. Goodness Trust savings account (the Trust account) at Citizens Bank, with both of them named on the accounts as Trustees.
5. Commencing February 26, 2004, the deferred monthly annuity payments have been deposited into the Trust account. These payments increase by 4% compounded annually. The signatures of both Trustees were required in order to withdraw funds from this account.
6. For the first 11 months of the annuity payments, the funds were withdrawn and deposited into Mary's personal checking account from which she paid all of the family bills. She had difficulty managing the account, and soon her bank began to return checks for insufficient funds. Thereafter, Francis opened his own personal checking account at Citizens Bank. It was into this account that he then transferred the Trust fund assets. The opening of personal accounts and the depositing of Trust fund assets into those accounts were conducted with the tacit approval of both Trustees. The Co-Trustees have not coordinated their activities relative to the handling of the Trust fund assets.
7. In 2004, the same year the annuity payments began, Francis ceased employment in order to take care of Matthew when Mr. Clarke, Matthew's personal caretaker, was not available.
8. Since its inception, the Trust fund assets have been used by Mary and Francis to support Matthew, as well as to support the entire Goodness family, including Mary, Francis, and the two other children. Francis believed he was entitled to compensation for taking care of his son; therefore, he withdrew and used Trust fund assets for his own personal use, including the purchase of beer on a regular basis. Mary believed that the Trust should pay for the rents not only on Matthew's studio apartment, but also for the entire rent on the adjacent apartment in which she and the two other children reside.
9. In October 2008, as part of ongoing contentious divorce proceedings between Francis and Mary, the Family Court ordered Francis to stay away from his family and the Trust. Essentially, this amounted to the defacto removal of Francis as a Trustee; however, because of jurisdictional issues, said portion of the Restraining Order was vacated after Francis voluntarily stipulated in the instant matter to refrain from accessing the Trust.
10. In October 2008, Mary gained exclusive control of the Trust fund assets. At the time she assumed control of the Trust, there only was a small balance in the Trust savings account. As Francis did previously, she transferred the funds into her personal checking account at Coventry Credit Union and then used the funds to pay Matthew's bills, as well as certain family bills incurred by herself and the other two children (for instance, her entire rent and half of her grocery expenses).
11. Mary opened a savings account at Citizens Bank on behalf of the Matthew W. T. Goodness Trust. Only Mary's name is on the account as Trustee. By the time the hearing occurred, Mary had deposited $1300 of accumulated principal into that account.
12. No accounting of the Trust fund assets ever has been made by either Trustee. At trial, neither Trustee produced any records of trust receipts and expenditures, and there was no evidence that either of them ever maintained books of account. *Page 5 
13. Each Trustee has co-mingled Trust fund assets with funds in his or her individual personal accounts, and they have used Trust assets to pay for personal items and debts. Furthermore, both Trustees have filed for personal bankruptcy in the past.
14. The Trust Instrument provides that if a Trustee must be replaced, by reason of death, disability, resignation or otherwise, the Fleet National Bank of Providence (Fleet) shall thereafter serve as Corporate Trustee, together with Barbara Cunningham, who served as Matthew's primary caregiver at the time of the creation of the Trust. Barbara Cunningham has left the State of Rhode Island and is not available to serve as Trustee. The Court takes judicial notice that Fleet National Bank no longer exists as a separate banking entity; instead, its successor-in-interest is Bank of America (BOA).
15. The Trust Instrument further provides that either Mr. or Mrs. Carpenter shall serve as Individual Trustees if Barbara Cunningham dies, or is unwilling or unable to serve. The Trust identifies the Carpenters as friends of Matthew.
16. Mr. Carpenter and Francis previously worked together at General Dynamics Electric Boat until approximately 1991/1992. Both he and his wife were friends of the Goodness family prior to the creation of the Trust. For at least the past ten years, neither of the Carpenters has seen, or been in contact with, Matthew, Francis, or Mary Goodness, and they do not know where Matthew resides. Until very recently, and after the commencement of this suit, the Carpenters had not met with Francis over the same period.
17. Mrs. Carpenter is employed by the City of Providence's Tax Collector's Office to receive and record tax payments made to the City. She did not graduate from high school.
18. Mr. Carpenter graduated from high school and currently works as a parking enforcement officer for the City of Providence.
19. While both Carpenters are willing to serve as Trustees, based upon their trial testimony, the Court finds neither of them has had much, if any, experience in handling the financial affairs of another person. Mrs. Carpenter indicated that she believed the bank would handle the money if she were appointed as Successor Trustee. She also stated that she would refer any disputes over improper spending to an attorney.
20. Matthew's current caregiver is Mr. Clarke, a thirty-year old man who is employed by Options, Inc., which is a Medicaid provider to Matthew. At the present time, Mr. Clarke is able to attend to Matthew's needs, and any Trustee appointed by this Court would be well advised to consult with Mr. Clarke concerning those needs.
21. Mr. Clarke has had no experience handling the financial matters or affairs of other people, and he admitted that he failed to file his tax returns for fiscal year 2008.
22. With the agreement of Francis and Mary, the Court appointed Attorney Paula Cucolo, Esq., as Matthew's guardian ad litem, in order to protect Matthew's interests while these proceedings are in progress. Attorney Cucolo is an experienced practitioner, who was appointed as a guardian ad litem and Trustee in at least one other legal proceeding. Attorney Cuculo prepared a report for this Court. Said report was thorough, credible, and admitted as a full exhibit at the hearing.
23. The Court recognizes that although Attorney Cuculo never has cared for Matthew's specific needs and disabilities, the Court has confidence that as a Trustee, Attorney Cuculo would be a disinterested Trustee who would be able and willing to handle the Trust assets and carry out the intention of the Trust to provide for the support, maintenance, health, and education of the primary beneficiary, Matthew Goodness. It *Page 6 
also has confidence that Attorney Cuculo would keep appropriate records to reflect the expenditure of Trust fund assets and would not co-mingle those funds with other assets.
24. Although they appear to be honestly concerned about Matthew's care and well-being, neither Francis nor Mary has demonstrated an understanding of the role and responsibilities of a fiduciary. Furthermore, as Matthew's parents and natural guardians, each would be available to communicate knowledge of Matthew's needs to a disinterested Successor Trustee, if necessary.
25. The ongoing hostility between Francis and Mary is palpable and has resulted in a detrimental impact to the administration of the Trust. Rarely, if ever, do they make joint determinations regarding the use of Trust assets, and neither has served as a check against the misuse of Trust assets by the other Co-Trustee.
26. Francis has displayed his temper toward Matthew to the point of Matthew becoming upset. He has been under the influence of alcohol while Matthew was in his care. Francis recently has been hospitalized and treated for depression.
27. Mary has used illicit drugs with Mr. Clarke, while Matthew was in her care and/or the care of Mr. Clarke.
 III Analysis
At issue in this case is whether either or both of the Co-Trustees should be removed as Trustees and, if both are removed, whom the Court should appoint as Successor Trustee(s).[5] After reviewing all of the evidence in the record, the Court is of the opinion that Francis and Mary both have breached their fiduciary duties to the Trust and should be removed.
It is well-established that "a trust is created when legal title to property is held by one person [the trustee] for the benefit of another [the beneficiary]." Lux v. Lux, 109 R.I. 592, 596, 288 A.2d 701, 704
(1972) (citing Gooding v. Broadway Baptist Church, 46 R.I. 106,125 A. 211 (1924). A valid trust exists even where several of the beneficiaries also act as trustees. See Gould v. Rhode Island Hospital Trust Co.,53 R.I. 422, 167 A. 199, 120-21 (1933). Furthermore, "a court should be more reluctant to remove a trustee named by the settlor than a trustee named *Page 7 
by the court or by a third person in the exercise of a power to appoint a trustee." Starter, 108 R.I. 326, 335, 275 A.2d 272 (quotingCurran v. Green, 18 R.I. 329, 27 A. 596 (1893)).
Generally speaking, "[w]hen trustees are in existence, and capable of acting, a court of equity will not interfere to control them in the exercise of a discretion vested in them by the instrument under which they act." Nichols v. Eaton, 91 U.S. 716, 724-725 (1875). However, "[w]here discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court except to prevent an abuse by the trustee of his [or her] discretion."Restatement (Second) of Trusts § 187 (1959).
A trustee always "is held to a high degree of loyalty to the beneficiaries of his [or her] trust." Sinclair v. Industrial Nat. Bankof Providence, 89 R.I. 461, 469, 153 A.2d 547, 551 (1959). InSinclair, the Court stated that
 "[b]roadly speaking it is clearly established that a trustee must give undivided loyalty to the trust confided to his [or her] care and to its beneficiaries. It is the policy of the law to see that in administering the trust he [or she] shall not be tempted in any way by conduct or circumstances to act otherwise than with complete loyalty to the trust and its interests. He [or she] must at all times exercise a high standard of honor and avoid all situations and transactions that tend to call his [or her] good faith into question and to create in himself [or herself] rights possibly conflicting with those of the beneficiaries." Id at 469, 153 A.2d at 552
(quoting Dodge v. Stone, 76 R.I. 318, 323-324, 69 A.2d 632, 634-635 (1949)).
A trustee violates his or her duty to a beneficiary when he or she uses Trust fund assets to make personal purchases of a substantial nature, or where he or she has a personal interest in such a purchase.See Dodge, 76 R.I. at 324, 69 A.2d at 635. Indeed, a trustee commits a breach of trust when he or she intends or attempts to appropriate trust funds for his or her own use. See Brault v. Bigham, 493 S.W.2d 576, 579
(Tex.Civ.App. 1973) ("An intended or attempted appropriation is just as much an indication of danger as though it had been consummated, and *Page 8 
hence is a ground for removal. Similarly a repudiation of the trust is a clear ground of removal."). Accordingly, a trustee must never place himself or herself in a position of "temptation." Dodge, 76 R.I. at 324,69 A.2d at 635.
A trustee may be removed from a trust for the following reasons:
 "the commission of breaches of trust or of conduct sufficient to show unfitness to administer the trust[;] being unsuitable to execute the trust[;] breaching fiduciary duties[;] mismanagement of trust property[;] self-dealing with trust property[;] repeatedly spending trust funds without mandated prior court approval[;] flouting of court orders regarding trust property[;] misuse of custodial funds for personal purposes and commingling of personal assets with custodial assets, as indicative of unfitness to act as trustee for noncustodial assets[;] failure or neglect or impropriety in the investment of the trust estate[;] failure to determine how to handle trust funds for an extended period[;] failure of a trustee to file accounts[;] willful and malicious action in refusing to comply with the provisions of a trust[;] unwillingness to take action with regard to trust property which is necessary to fulfill the primary purpose of the trust[;] failure to distribute income from the trust for an extended period[;] refusing to permit the beneficiary to inspect the trust's records[;] the failure to collect all trust assets[; and] filing inaccurate income tax returns[.]" 76 Am. Jur. 2d Trusts § 230 (2000).
In contemplating the removal of a trustee, "[a]ll circumstances affecting a trustee's ability to perform his or her duties may be considered. . . ." Id Furthermore, "[p]roof of actual past wrongdoing by a trustee is not necessary if some other legally proper ground for removal exists." InreEstateofKlarner. 98 P.3d 892, 898 (Colo.App. 2003).
One of duties that trustees must perform is management of the corpus of the trust. In performing that duty
 "[fjrustees must be prudent and vigilant and exercise a sound judgment. They are to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income as well as probable safety *Page 9 
of the capital to be invested." Donato v. BankBoston, N.A., 110 F.Supp.2d 42, 48 (D.R.I. 2000)
Furthermore, "[i]n investing and managing trust assets, a trustee may only incur costs that are appropriate and reasonable in relation to the assets, the purposes of the trust, and the skills of the trustee." G. L. 1956 § 18-15-7. It follows that a trustee must not waste trust property.See Dennis v. Rhode Island Hosp. Trust Nat. Bank, 571 F.Supp. 623, 632
(D.C.R.I. 1983) (citing Restatement (Second) of Trusts § 239 comment a (1959)) ("Wasting property consists of such interests as terminate or necessarily depreciate in the course of time either because of the nature of the interest or because of the character of the subject matter of the interest.").
In addition, "[w]hen friction between the trustee and beneficiary or between the trustee or his [or her] co-trustees impairs the proper administration of the trust or if future cooperation between the trustees is improbable or if the trustees' continuing to act as such would be detrimental to the interest of the beneficiary, the trustee may be removed. Petition of Starter, 108 R.I. at 335, 275 A.2d at 276. The Court's paramount duty in deciding such cases "is to see that the trust is properly executed and that the beneficiaries are protected." Id Considering that "[fjrustees exist for the benefit of those to whom the creator of the trust has given the trust estate[,]" it stands to reason that "[w]hen the ill feeling has reached the point that it interferes with the administration of the trust, the trustee may be removed even though the charges of his misconduct are either not made out or greatly exaggerated." Id at 335-36, 275 A.2d at 276. Furthermore, "[p]roof of actual past wrongdoing by a trustee is not necessary if some other legally proper ground for removal exists [such as] [irreconcilable conflicts between the trustee's personal interests and those of the trust estate and its beneficiaries. . . ." In re Estate of Klarner,98 P.3d 892, 898 (Colo.App. 2003). *Page 10 
 A Removal of a Trustee
In the instant matter, although the Co-Trustees also are the secondary beneficiaries, the validity of the Trust is not at issue. Rather, the issue confronting the Court is whether, given their prior course of conduct, the Co-Trustees are capable of properly carrying out their duties as Trust fiduciaries.
Section Two, Article Four, of the Trust grants its Trustees "all the powers, privileges and authority conferred on trustees by the Rhode Island General Laws[,]" as well as "any powers (whether or not specifically stated or referred to herein) . . . consistent with fiduciary conduct under such laws which are necessary to be exercised in order to administer the trust created herein in a businesslike manner. . . ."
Section Two, Article Three, of the Trust directs its Trustees to
 "distribute such portions of the net income and principal thereof as the Trustees, in their sole and uncontrolled discretion, may from time to time deem necessary or advisable
 (1) to provide for the support, maintenance, health and education of the Primary Beneficiary;
 (2) to furnish for the Primary Beneficiary the care, services, evaluations, supplies, equipment, vehicles, furnishings, architectural renovations and other elements recommended for the Primary Beneficiary by his health care providers, educators or deemed advisable for the Primary Beneficiary's best interest by the Trustees;
 (3) to furnish for the Secondary Beneficiaries the care, services, evaluations, supplies, equipment, vehicles, furnishings, architectural renovations and other elements recommended for the Secondary Beneficiary by health care providers;
 (4) to reimburse the Secondary Beneficiaries for any disbursements or payments heretofore or hereafter made by them for the care, services, evaluations, supplies, equipment, vehicles, furnishings, architectural renovations or other elements. *Page 11 
 Provided, however, that any undistributed income is to be accumulated and added to the principal of the trust estate. The Trustees may make any distribution without the intervention of any party or other legal representative, in any of the following ways: (1) to a beneficiary directly; (2) to the legal or natural guardian of a beneficiary; (3) to any person having custody of a beneficiary; or (4) by utilizing the distribution directly for a beneficiary's benefit."[6]
Section Two, Article Nine (A)(1), requires the Trustees to "keep books of account respecting the trust and all trust instruments, and shall furnish to the beneficiaries, or to the person having the care and custody of any beneficiary if such beneficiary is then under a legal disability, statements at least quarterly showing receipts and disbursements of income and principal of the trust."
At trial, the hostility between Francis and Mary was palpable. Each accused the other of a variety of transgressions which, while perhaps relevant to the ongoing divorce proceedings, were not relevant to, and did not directly impact, management of the Trust itself. Suffice it to say, however, that the depth and breadth of the Co-Trustees' reciprocal hostility undermined the credibility of much of their respective trial testimony. Nevertheless, viewing the record as a whole, including the documentary exhibits, the Court now will make the following conclusions:
Attorney Cuculo credibly testified that she believed that Francis was incapable of serving as a Trustee based upon his unexplained expenditures and lack of savings when he controlled the Trust funds. She also testified that she believed that Mary would be a suitable Trustee, provided that she received assistance, advice, and Court oversight. However, the record reveals that Co-Trustees Francis and Mary both used Trust fund assets for their own personal expenses. See Dodge,76 R.I. at 324, 69 A.2d at 635. Francis regularly remunerated himself out of Trust fund assets for what he perceived to be his due in caring for his son. Mary used/uses Trust fund assets *Page 12 
to pay the rent on the duplex apartment that she and her other two children occupy and to pay for half of the family's grocery expenses.See id.
At trial, both Trustees displayed an obvious and continuing sense of personal entitlement to Trust fund assets. See Sinclair, 89 R.I. at 469,153 A.2d at 552. While they each displayed a genuine concern for Matthew's wellbeing, their prior actions demonstrate how they allowed their individual personal interests to trump those of the Trust.See id At a minimum, such conduct constituted wasting of Trust fund assets. See Dennis, 571 F.Supp. at 632. It also demonstrates their questionable loyalty and commitment to the terms and objectives of the Trust. See Sinclair, 89 R.I. at 469, 153 A.2d at 552.
The record reveals that the Trust has received considerable funds since the inception of the monthly annuity payments; however, at the time of trial, the Trust contained only $1300 in principal, and there is no explanation as to how the Trust funds have been expended over the years because neither Co-Trustee ever has provided any accounting of Trust fund assets and expenditures. The documentary evidence shows that the monthly annuity payments were/are deposited into the Trust fund account but that said account only ever carries a nominal monthly balance because the payments then generally would be transferred into the Trustees' personal checking accounts. Until October 2008, said transfers were made to a personal checking account belonging to Francis. Since then, the deposits have been transferred into Mary's personal checking account.
Once the funds were transferred into a personal checking account, the owner of that account (either Francis or Mary) used the funds to pay for Trust expenses in addition to paying for his or her own, unaccounted for, personal expenses. Such behavior constituted an impermissible co-mingling of funds, as well as an improper depletion of Trust fund assets. Such *Page 13 
conduct amounted to breaches of fiduciary duty on the part of both Francis and Mary. See 76 Am. Jur. 2d Trusts § 230 (2000).
Even had the Co-Trustees not breached their fiduciary duty to the Trust, they each have displayed an inability to comprehend their individual roles and responsibilities as fiduciaries, as well as an understanding of how to manage and administer a trust. Furthermore, the Court concludes that the palpable hostility between Francis and Mary has interfered with the proper administration of the Trust. In light of their ongoing role as Matthew's parents, this hostility likely would continue to interfere with the administration of the Trust, thereby militating against the removal of only one of them as Trustee.
Accordingly, this Court concludes that both Francis and Mary have (1) breached their duty of loyalty to the Trust; (2) impermissibly co-mingled Trust funds with their personal funds; (3) wasted and depleted Trust fund assets; and (4) breached their fiduciary duty to the Trust. Consequently, and in view of the foregoing, the Court orders the removal of Francis and Mary Goodness as Co-Trustees of the Matthew T. Goodness Trust.
 B Appointment of a Successor Trustee
In light of the Court's removal of Francis and Mary as Co-Trustees of the Trust, the Court now must decide whom it should appoint as the Successor Trustee(s). Francis contends that the Court is bound by the explicit terms of the Trust in making such an appointment. Mary, however, maintains that the Court should consider whether the named successors adequately could fulfill the spirit and intent of the Trust.
Section Two, Article Seven of the Trust provides:
 "If at any time prior to the termination of this trust, there shall be no more Trustee serving hereunder as a result of death, disability, *Page 14 
resignation or otherwise, THE FLEET NATIONAL BANK of Providence, Rhode island [sic], shall then and thereafter serve as Corporate Trustee hereunder, together with Barbara Cunningham (nurse of the Primary Beneficiary) as individual Trustee, if she is willing and able to serve as Individual Trustee. Thereafter, if Barbara Cunningham dies or is unwilling or unable to serve as Individual Trustee, then upon motion by any interested party, the Court may appoint one or more Successor Individual Trustees to serve as Co-Trustees with the FLEET NATIONAL BANK. If available and willing to serve, such appointment shall be Peter Carpenter (friend of the Primary Beneficiary) or Angel[it]a Carpenter (friend of the Primary Beneficiary) prior to the appointment of any other person as an Individual Trustee."
The Trust designates Fleet as Successor Trustee in the event that the Trust does not have any serving Trustees. Considering that Fleet no longer exists as a separate entity, the first issue to be addressed is whether Fleet's successor bank in interest, BOA, stands in Fleet's shoes as Successor Trustee.
It is well settled that "[i]n analyzing a statute comprised of language that is clear and unambiguous, this Court applies the statute as written by giving the words their plain and ordinary meaning."Mullownev v. Masopust 943 A.2d 1029, 1034 (R.I. 2008). In construing the General Assembly's intent when enacting a statute, the Court "always begin[s] with the principle that the plain statutory language is the best indicator of legislative intent." Id.
General Laws 1956 § 19-7-5(l)(ii) provides in pertinent part:
 "The successor bank shall be deemed to be a continuation of the entity and identity of the predecessor bank, and all the rights, obligations, and relations of the predecessor bank to or in respect to any . . . beneficiary of any trust and in respect to any executorship or trusteeship or trust or other fiduciary function, including appointments, designations, and nominations, shall remain unimpaired."
The Court concludes from the plain and ordinary meaning of the foregoing provision that when BOA absorbed Fleet into its banking operations, BOA replaced Fleet as the designated Successor *Page 15 
Trustee of the Matthew W.T. Goodness Trust. Consequently, the Court appoints BOA as a Successor Trustee. The Court now must consider whether it should appoint any of the individuals named in the Trust to serve as a Successor Co-Trustee.
At the outset, the Court observes that the first-named Successor Trustee, Ms. Cunningham, is not available to serve as a Co-Trustee because she has left the state and her whereabouts are unknown. The Trust provides that should Ms. Cunningham be unavailable to serve, then an interested party may petition the Court to appoint either Mr. Carpenter or Mrs. Carpenter to serve as a Successor Co-Trustee.[7]
Although no formal petition to appoint either Carpenter as a Successor Co-Trustee has been submitted to the Court, Francis has expressed his desire that they be appointed. Considering that both Carpenters testified at trial and demonstrated a willingness to serve, the Court will determine whether it should appoint either of them to act as a Successor Co-Trustee.
The record reveals that at one time, the Carpenters were friendly with the Goodness family and that all of them socialized fairly frequently. Well over ten years ago, however, the Goodness family changed its residence and left no forwarding address. The Carpenters did not see or speak to either Francis or Mary during this period, and it was not until they were contacted as a result of the instant litigation that they met with Francis. At trial, they admitted that they had not had any recent personal contact with either Mary or Matthew.
The Court acknowledges that of itself, the lack of contact between the families has no bearing on the administration of the Trust; however, it points to a breakdown in the relationship between the Carpenter family and Goodness family that undermines the intent of the Settlors to appoint either of them as a Successor Trustee. Indeed, Mary's objection to the appointment of *Page 16 
either Carpenter supports such a conclusion. Furthermore, when juxtaposed against their lack of contact with Mary and Matthew, the recent social contact between the Carpenters and Francis, coupled with the fact that they testified on his behalf, lends weight to Mary's fear that Francis might attempt to assert improper influence over their administration of the Trust.
Mrs. Carpenter stated that she was unaware that she had been named as a Successor Trustee until contacted during the course of this litigation. She testified that she previously has not served as a trustee, never has invested other people's money, and did not finish high school. Indeed, when questioned about how she would handle the monthly annuity, she said that she "wouldn't personally handle the money, the bank would." She also stated that she would query any spending of Trust funds that she considered improper and would seek the advice of counsel if such spending continued.
Mr. Carpenter also never has served as a trustee. While he did take care of his sick father's bills for a period of time and has some bookkeeping experience, he admitted that he has no experience in managing and investing the personal finances of others.
In light of the foregoing, and cognizant of the fact that one of the Settlors (Mary) objects to their appointment, the Court concludes that neither Carpenter would be suitable to serve as a Trustee. The Court is concerned that their lack of financial experience would make them vulnerable to undue influence and that they would spend too much time second-guessing any decisions that they might make. Consequently, the Court declines to appoint either of the Carpenters as a Trustee.
The Court next must consider who, if anyone, should be appointed as an Individual Successor Trustee. Mary suggests that Mr. Clarke would be an appropriate Trustee; however, the Court rejects such a suggestion. *Page 17 
There is no evidence in the record that Mr. Clarke possesses any kind of financial experience. Furthermore, his failure to file his 2008 tax returns demonstrates a lack of compliance with his state and federal legal obligations, as well as a lack of the necessary responsibility needed to manage a trust.
Furthermore, the Court has grave concerns over whether Mr. Clarke would be a disinterested Trustee. During the trial, the Court observed Mr. Clarke's demeanor very attentively. He displayed obvious closeness to Mary and noticeable disdain for Francis. Should this Court appoint Mr. Clarke as a Trustee, such dynamics likely would contribute to further friction between Mary and Francis to the detriment of Matthew. In addition, although Mr. Clarke's salary is not paid by the Trust, the record reveals that he frequently used Matthew's van for personal use. Furthermore, because it is he who usually accompanies Matthew on his outings, Mr. Clarke would personally benefit from decisions he might make concerning Matthew's entertainment, such as travel, concerts, movies, and restaurants.
In light of the foregoing, the Court concludes that Mr. Clarke would not be a suitable Successor Trustee. The Court next will consider whether it should appoint Matthew's guardian ad litem, Attorney Cuculo, as a Co-Trustee to serve with BOA.
Attorney Cuculo has expressed a willingness and ability to serve as a Trustee. As this Court already has found, Attorney Cuculo is an experienced practitioner who currently is serving capably as a Trustee and Guardian of the beneficiary of an unrelated Trust after being appointed by a Justice of the Superior Court. Such appointment satisfies the Court that Attorney Cuculo possesses the necessary ability to appropriately manage a special needs Trust such as the one before the Court. She clearly has the skills necessary to invest Trust fund assets, to account for those investments, and to manage the investments separate and distinct from non Trust fund *Page 18 
assets. The Court additionally concludes that although Attorney Cuculo is not familiar with Matthew's specific needs, those needs may be ascertained after consultation with Matthew's parents and caregivers. Furthermore, Attorney Cuculo's lack of a previous relationship with Francis and Mary may be beneficial to her already disinterested and impartial position vis-a-vis the Trust.
Consequently, the Court concludes, and is satisfied, that Attorney Cuculo would be suitable to serve as a Trustee for the Matthew W. T. Goodness Trust. However, the Court declines to appoint her as Trustee at this point in time because it further concludes that the Trust does not need a Co-Trustee to serve with BOA. However, out of an abundance of caution, the Court employs its equitable powers to name Attorney Cuculo as an alternative Successor Trustee. In the event that BOA should decline, for any reason, to accept its appointment as Trustee, the Court then will appoint Attorney Cuculo as Trustee. This Court believes and is satisfied that the removals and subsequent appointment(s) are necessary to enable the Trust to be properly executed and to fulfill its primary function of protecting Matthew's best interests.
 IV Conclusion
For the foregoing reasons, the Court orders the removal of Francis and Mary Goodness as Co-Trustees of the Matthew W. T. Goodness Trust. The Court appoints Fleet Bank's successor-in-interest, Bank of America, as the Successor Trustee. Furthermore, the Court amends the trust to name Attorney Cucculo as Bank of America's Successor Trustee, and will appoint her as Trustee in the event that Bank of America is unable or unwilling to serve.
[1] Section 8-2-13 provides in pertinent part:
 "The superior court shall, except as otherwise provided by law, have exclusive original jurisdiction of suits and proceedings of an equitable character and of statutory proceedings following the course of equity; provided, however, that every probate court shall have the power, concurrent with the superior court, to replace, remove, or fill any vacancy of any trustee under a trust established under a will
Section 18-2-1 provides in pertinent part:
 "[W]henever a trustee, either original or substituted, and whether appointed by a court or otherwise, . . . refuses to act or is incapable of acting as trustee, then any person interested under the trust, or the surviving or continuing trustees or trustee for the time being, or the personal representatives of the last surviving or continuing trustee, may apply to the superior court and the court may at that time, after due notice to the parties in interest, or to any of them that the court shall adjudge to be necessary parties, appoint some suitable person or persons to be trustee or trustees, or new trustee or trustees, as the case may be, under the trust."
[2] Mrs. Carpenter's name was misspelled as "Angela" both in the Trust instrument and in her affidavit.
[3] The parties submitted post-trial memoranda. Accompanying Mary's memorandum was a purported stipulation of exhibits that was not signed by counsel for Francis and that included documents not introduced at trial. The Court will not consider the contents of those supplemental documents in its Decision.
[4] While no evidence of any initial lump sum settlement was presented at the hearing, it appears circumstantially that such payment was made.
[5] Section Two, Article Ten of the Trust provides in pertinent part: "This trust agreement and this trust may be amended, modified, revoked or terminated by a court of competent jurisdiction at any time prior to the termination herein provided, upon proper motion by an interested party."
[6] There is no evidence in the record that it was in Matthew's best interest that the Trust furnish Francis with compensation or that it pay for the entirety of Mary's rent.
[7] Both Carpenters have expressed a willingness to serve as Trustees; however, the Trust names either Mr. or Mrs. Carpenter a as a Successor Trustee — it does not name them as Co-Trustees. *Page 1